**TRENK, DiPASQUALE,**
**DELLA FERA & SODONO, P.C.**
347 Mount Pleasant Avenue
West Orange, New Jersey 07052
(973) 243-8600
Anthony Sodono III
Shoshana Schiff
*Proposed Counsel for NJ Healthcare Facilities*
*Management LLC Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NJ HEALTHCARE FACILITIES MANAGEMENT LLC a/k/a NEW JERSEY HEALTH CARE FACILITIES MANAGEMENT LLC d/b/a ADVANCED CARE CENTER AT LAKEVIEW,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-14871 (VFP)<br><br>Honorable Vincent F. Papalia |

**CERTIFICATION OF LINDA BOWERSOX**
**IN SUPPORT OF FIRST DAY MATTERS**

**LINDA BOWERSOX**, being of full age, hereby certifies as follows, pursuant to 28 U.S.C. § 1746:

1. I am the Managing Member of NJ Healthcare Facilities Management LLC a/k/a New Jersey Health Care Facilities Management LLC d/b/a Advanced Care Center at Lakeview (the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case. I am authorized by the Debtor to submit this certification. I am fully familiar with the business and affairs of the Debtor, including the facts and circumstances set forth herein.

2. I submit this certification (the "Certification") in support of the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code") and the relief that the Debtor has requested from the Court in various motions and applications filed contemporaneously herewith (the "First Day Pleadings"). I believe that the relief sought in each of the First-Day Pleadings (i) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption in its operations or loss of value; and (ii) best serves the interests of the Debtor's estate and creditors.

3. Except as otherwise indicated, the facts set forth in this Certification are based upon my personal knowledge, information supplied to me by other members of the Debtor's management or its professionals, information learned from my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. This Certification is intended to provide a brief background of the Debtor, a description of the Debtor and its services, the reasons for the Debtor's chapter 11 filing, the Debtor's objectives in the chapter 11 process, and a summary of the relief sought in each of the First-Day Pleadings. If called as a witness in the Debtor's bankruptcy proceedings, I could and would testify competently to the facts set forth in this Certification. Unless otherwise indicated, all financial information set forth in this certification is presented on an unaudited basis.

## OVERVIEW OF THE DEBTOR AND ITS FACILITY

4. The Debtor is a 102 skilled-bed and 19 ventilator-bed subacute rehabilitation and outpatient care facility. NJ Healthcare Facilities Management, LLC ("NJ Health Care") is a New Jersey limited Liability company that maintains its principal place of business at 130 Terhune Drive, Wayne, New Jersey. NJ Health Care currently operates the facility under the name Advanced Care at Lakeview (the "Facility").

5. The Debtor employs over 175 people, including a total of twelve (12) nurses and respiratory specialists who have obtained advanced training known as "ACLS," or Advanced

Cardiac Life Support. Facilities comparable to NJ Health Care rarely, if ever, employ more than one individual with certified ACLS training.

6. In 2012, Advanced Care Center at Lakeview was the first facility in the United States to be granted the Pathway to Excellence in Long Term Care® designation by the American Nurses Credentialing Center. This designation substantiates the professional satisfaction of nurses and identifies Advanced Care Center at Lakeview as one of the best places to work. The Facility earned this distinction by successfully undergoing a thorough review process that documented foundational quality initiatives in creating a positive work environment, as defined by nurses and validated by research. This achievement signifies the outstanding service and exemplary levels of treatment that the Debtor provides at its Facility. These initiatives are supported by the Advanced Care Center at Lakeview's "commitment to building upon our history of excellence," the facility's vision, mission, and statement of values.

7. In 2013, recognizing the increasing complexity of patients' conditions, the Facility's strategic plan included planning for the provision of providing an advanced level of care, both clinically and diagnostically. Through attrition, licensed practical nurses were replaced with professional registered nurses. Clinical staff at all levels completed an advanced curriculum geared towards caring for the more acute patient outside of the traditional hospital setting.

8. In addition, the Debtor has an advanced medical diagnostic lab on-site which eliminates precious time that is lost when patient samples are shipped to laboratories elsewhere in the state to accurately diagnose a patient's particular issues. The facility's on-site lab is also important for local hospitals, as laboratory tests can be done on-site at the Debtor's Facility in collaboration with hospitals and/or the patients' doctors, which reduces re-admissions to the

hospitals and frees up the hospitals' space for more emergent and pressing needs. No other subacute care facility in the State of New Jersey has this type of diagnostic lab on-site.

9. Further, a New Jersey Department of Health survey in April 2013 ranked the Debtor's Facility as among the best subacute facilities in the state. The survey did not cite a single care-related deficiency.

10. Recently, the Debtor confirmed with the New Jersey Department of Health the development of a brand new "prototype" program that has never been performed in New Jersey with a facility like the Debtor's for the direct admission of patients to the facility, when necessary and appropriate, in collaboration with local hospitals; further reducing patient loads and potential overcrowding at the hospitals themselves.

11. The Debtor has all appropriate insurance coverage. See annexed **Exhibit A**.

## OWNERSHIP OF THE DEBTOR'S FACILITY

12. Prior to June 2012, the Facility was owned by a limited liability company known as Grosso Realty Investment and Management, LLC ("Grosso Realty"), and operated by Lakeview Subacute Care Center, Inc., pursuant to a lease agreement between those two parties.

13. Dolores Grosso is the sole member of Grosso Realty, and Richard F. Grosso, Sr., is a former member of Grosso Realty. Richard Grosso, Jr., and Richard F. Grosso, Sr., are former members of NJ Health Care. Linda Bowersox is the majority member of NJ Health Care and oversees all of its operations at the Facility. Ms. Bowersox has never been affiliated in any way with Grosso Realty. Richard Grosso is the Debtor's Director of the Facility and the Administrator of Records.

14. In or about May 1999, Grosso Realty obtained a loan in the principal amount of $7,500,000 from GMAC Commercial Mortgage Corp. ("GMAC") and executed, *inter alia*, a

Promissory Note, dated May 27, 1999, agreeing to repay the note. At that time, Grosso Realty secured its repayment of that $7,500,000 note by executing and delivering to GMAC, *inter alia*, a first priority mortgage in its favor against the Facility.

15. Thereafter, in or about December 2005, Grosso Realty entered into a loan modification agreement with GMAC under which the principal amount of the indebtedness owed by Grosso Realty to GMAC was increased to $8,000,000.

16. In connection with that December 2005 transaction, Grosso Realty executed, *inter alia*, an Amended and Restated Promissory Note, dated December 15, 2005, in the principal amount of $8,000,000 as well as a mortgage modification agreement (hereinafter referred to as the "GMAC Mortgage") securing Grosso Realty's repayment of the same.

17. Subsequent to the recording of the GMAC Mortgage, GMAC changed its name to Capmark Finance Inc. in May 2006 and later converted to a limited liability company, Capmark Finance LLC ("Capmark"), in September 2011.

18. Capmark was the holder of the GMAC Mortgage from May 2006 until the mortgage was satisfied in or about December 2012, as more fully set forth below.

19. The GMAC Mortgage initially matured on December 15, 2009.

20. Grosso Realty was able to have Capmark refrain from foreclosing upon the Facility for an extended period of time. After the GMAC Mortgage matured, Capmark ultimately renewed its demand in mid-August 2011 for the immediate payment of the entire balance due under the GMAC Mortgage.

21. In November 2011, Capmark commenced foreclosure proceedings against the Facility in the Superior Court of New Jersey, Chancery Division, Passaic County, under Docket No. F-009119-11.

22. As a result of its urgent need to find replacement financing to satisfy the GMAC Mortgage, and lacking the substantial resources to perform needed upgrades to the Facility and to expand the same to offer high-end single rooms, which Grosso Realty had determined after an extensive study would transform the Facility into an extremely profitable one, Grosso Realty sought out several potential sources of funding.

23. One of the entities with whom Grosso Realty had such discussions in late 2011/early 2012 was the Feiner Investment Corporation of Skokie, Illinois, and its principal, Zvi Feiner.

24. Ultimately, in or about March 2012, Grosso Realty reached an agreement with the Feiner Investment Corporation in which the parties entered into an Asset Purchase Agreement with Feiner, under which Grosso Realty would, *inter alia*, convey title to the Facility to a Feiner affiliated entity, which became FNR Lakeview LLC ("FNR"). In addition, the new entity (known as NJ Health Care) would lease back the Facility from FNR while also being provided with a firm option to purchase the property in the future.

25. Under the parties' Asset Purchase Agreement, dated March 6, 2012 (the "APA"), FNR agreed to pay Grosso Realty a purchase price of $7,080,000 in immediately available funds at closing, plus or minus applicable prorations and credits, the vast bulk of which was intended to be used by Grosso Realty to pay Capmark the negotiated payoff amount owed under the GMAC Mortgage.

26. In addition, FNR also agreed that it would enter into a lease with NJ Health Care under which NJ Health Care would lease the subject premises from FNR as well as the License Rights (including, but not limited to, the right to assume its Medicare certification from the U.S. Centers for Medicaid and Medicare Services and its Medicaid participation agreement) and the

6

personal property, furniture, equipment, and fixtures associated with the operation of the Facility (the "Lease"). The Lease was dated June 19, 2012, but did not become effective until the closing of the sale of the Facility to FNR, which occurred on June 29, 2012 (the "Closing").

27. Moreover, as additional consideration for the sale and as the "lynchpin" of the overall transaction between FNR and Grosso Realty was FNR's commitment that it would promptly invest a total of $3,000,000 into the Facility. These monies were to be used first, to make certain renovations to the Facility, and even more importantly, to fund the construction of a second floor expansion that both parties projected would greatly enhance the Facility's census and make the same the premier rehabilitation and outpatient care facility in the area. FNR's commitment and obligation to provide this funding are memorialized both in the APA and in the Lease.

28. Although the APA initially set the total amount of FNR's funding for Capital Improvements to the Facility at $2,920,000, which funding was to occur prior to, or at, the Closing, this figure was later changed to $3,000,000 in the Lease.

29. The mechanism for funding the capital improvements remained consistent throughout the entire transaction. The $3,000,000 in funds that FNR was to make available to NJ Health Care was to be broken down into two accounts as follows: 1) $2,500,000 in what was called the "Leasehold Improvement Reserve"; and 2) $500,000 would be placed into the "CapEx Reserve." The $2,500,000 in the Leasehold Improvement Reserve was specifically earmarked for new construction and renovations to the Facility, including the second story addition, while the $500,000 in the CapEx Reserve was to be used for smaller-scale, yet important, capital improvements to be made at the Facility during the first year of the Lease term.

30.   In early May 2012, however, less than a month before the parties' then anticipated closing date (on or before June 1, 2012), FNR proposed an alternative transaction to Grosso Realty under which it would not pay the $7,080,000 purchase price in cash at the Closing. Instead, FNR proposed that, if the maturity of the GMAC Mortgage could be extended for an additional six (6) months after the Closing, FNR would assume the GMAC Mortgage after partially paying down the same by $1.5 million while offering Zvi Feiner as an additional guarantor of that Mortgage until it was paid off.

31.   Notwithstanding the radical changes proposed by FNR in the payment of the subject purchase price, FNR, nevertheless, reaffirmed that it would still fund the Capital Improvements to the Facility prior to, or at, the Closing.

32.   Moreover, from the inception of the parties' negotiations regarding Grosso Realty's sale of the Facility, Zvi Feiner had represented to the members of Grosso Realty, Richard Grosso Jr., and the member of NJ Health Care on several occasions that he had sufficient monies available from his own funds to purchase the Facility and to fund the contemplated improvements, and that he did not require any bank or other institutional financing to accomplish the same.

33.   Ultimately, the APA was amended seven times prior to the Closing. In particular, the Fifth Amendment to the APA, executed approximately one month prior to the actual Closing, provided that FNR would receive a credit in the amount of $200,000 against the purchase price for Zvi Feiner's willingness to guaranty personally the payoff of the GMAC Mortgage.

34.   Indeed, throughout the period in which the subject transaction was being revamped by Feiner, Grosso Realty, and NJ Health Care were engaged in intense negotiations

with representatives of Capmark to reach a settlement of the foreclosure action and to structure a work-out and discounted pay-off figure for the GMAC Mortgage.

35. Eventually, on or about June 21, 2012, a comprehensive settlement agreement was reached among all the parties that addressed not only the pending foreclosure action, but also the satisfaction of the GMAC Mortgage. Under that settlement, Capmark agreed that it would accept a discounted payoff figure of $6 million if it was paid as follows: (a) $1,000,000 upon the Closing on Grosso Realty's sale of the Facility to FNR; and (b) the $5,000,000 balance due no later than six (6) months after that Closing date.

36. After successfully negotiating the 6-month deferment in the full payoff of the GMAC Mortgage, Feiner then re-visited FNR's commitment to fund the $2.5 million Leasehold Improvement Reserve at the Closing in order to delay the funding of the same as well.

37. In fact, the Seventh (and final) Amendment to the APA, executed on June 25, 2012, just four (4) days prior to the Closing on June 29, extended the time for FNR to fund the Leasehold Improvement Reserve to December 31, 2012. This amendment was directly tied to the arrangement FNR had made with Capmark to pay off the GMAC Mortgage by the end of 2012, giving FNR more time to obtain or generate sufficient funds to satisfy both its mortgage and capital funding obligations.

38. The reduced GMAC Mortgage payoff and six (6)-month extensions that FNR negotiated with Capmark and NJ Health Care meant that FNR would only have to payout $1,300,000 in cash on account of those obligations at the time of the closing in June 2012. This was in stark contrast to its original agreement that required FNR to pay a total of approximately $9,000,000 at or prior to the time of Closing to satisfy the outstanding mortgage and to fund fully all of the Capital Improvements envisioned by the parties.

9

39. Indeed, having exhausted countless hours to structure this comprehensive work-out arrangement, the parties (Grosso Realty, NJ Health Care, and Richard Grosso, Jr., personally) were left with no other viable alternatives or options, and accordingly, capitulated to the same. Nevertheless, they did so based on the express representations of Feiner that FNR would fully and timely perform all of its obligations under all the agreements as re-vamped.

40. On June 29, 2012 the subject transaction between FNR and NJ Health Care closed, and title to the Facility was conveyed to FNR.

41. Consistent with the settlement that had been struck with Capmark, Zvi Feiner executed his limited Payment and Performance Guaranty Agreement in favor of Capmark as to the GMAC Mortgage around that same time.

42. It was contemplated that the new addition, funded by FNR through the Leasehold Improvement Reserve, would provide an additional forty (40) beds, which would be brand new single rooms, and when combined with other existing rooms that would be reconfigured within the Facility, would enable NJ Health Care to offer an additional sixty-four (64) private rooms.

43. In establishing the rents to be paid by NJ Health Care to FNR under the Lease, the parties had calculated those rents *based upon* the specific assumption that the addition would be timely completed and that the substantial revenue projected to be generated therefrom would be received by NJ Health Care. In essence, the amount of NJ Health Care's rent obligation was based upon the Facility being a "finished product" once the expansion and other ancillary renovations were completed.

44. The first phase of renovations was performed at the Facility during the second half of 2012 and into early 2013. Those renovations were paid for through FNR's $500,000 in the

Case 15-14871-TBA    Doc 11    Filed 03/20/15    Entered 03/20/15 15:05:45    Desc Main
                    Document      Page 11 of 19

CapEx Reserve, with NJ Health Care advancing an additional sum of approximately $200,000 from other funds to complete those renovations.

45.     In addition to the closing of title and execution of the Lease, FNR and NJ Health Care also entered into a Purchase Option Agreement (the "Purchase Option"), dated June 30, 2012. NJ Health Care has never wavered in its desire to eventually exercise the Purchase Option.

46.     The parties' overall arrangement was a complex commercial transaction consisting of a number of agreements to make the entire "deal" work as intended.

47.     When the Lease was executed, the parties contemplated that FNR would make its best efforts to obtain bank financing to refinance and payoff the GMAC Mortgage. FNR never disclosed to NJ Health Care, however, that it intended to and would limit its search to nonrecourse financing only.

48.     By December 2012, FNR claimed that despite its efforts, it was unable to obtain such bank financing and that it was obligated to obtain alternative financing at higher interest rates for the short term to avoid a default and foreclosure under the GMAC Mortgage and the previously executed settlement documents with Capmark.

49.     FNR ostensibly obtained such alternative financing, although the terms of the same have never been disclosed to the Debtor, and the GMAC Mortgage was fully satisfied by the end of 2012.

50.     FNR, however, did not provide any funding for the Leasehold Improvement Reserve by the end of 2012 despite being required to do so by the Seventh Amendment to the APA. In fact, to date, FNR has failed and/or refused to contribute any monies toward

construction of the second-floor addition that is, and has always been, an integral and critical part of the entire transaction.

51. Moreover, due to the difficulties FNR claimed it had experienced in trying to obtain such replacement financing, and at FNR's request, the parties entered into an amendment of the Lease in mid-December 2012. Under that Amendment, FNR was given an extension until June 30, 2013 to obtain traditional mortgage financing in an amount at least equal to $6 million for a minimum term of 3 years, at an annual interest rate of 7%, or less, to replace the alternative financing that it had obtained. Said terms were incorporated into a document entitled, "First Amendment to Lease Agreement," dated December 18, 2012 (the "Lease Amendment").

52. Despite the fact that NJ Health Care has paid more than $1.3 million to FNR in rent, FNR claims that, to date, it has been unable to obtain traditional mortgage financing as contemplated in the Lease and the Lease Amendment. Contrary to FNR's contentions, however, NJ Health Care is not to blame for FNR's failure to secure a financing package to its liking.

53. Furthermore, FNR continually spurned NJ Health Care's offers to provide FNR with assistance in locating one or more suitable lenders, who would be interested in providing FNR with the requisite financing. FNR indicated that it preferred to continue to pursue financing through its own contacts.

54. When it appeared that FNR would not be able to obtain the financing it was seeking upon the terms to which it was prepared to agree, NJ Health Care renewed its efforts to have FNR pursue financing through its sources instead.

55. Unfortunately, to date, FNR has been unable and/or unwilling to perform its obligations under the Lease and the APA to fund the $2,500,000 Leasehold Improvement Reserve for, inter alia, the construction of the new addition at the Facility.

56. This is, and has been, a very material breach of the agreements between the parties, going to the essence of the entire transaction with FNR, and has prevented all of the parties from realizing the substantial benefits that were contemplated and which should have been realized from the transaction.

57. As a direct consequence of all of the foregoing delays in the commencement (and completion) of the expansion project at the Facility, NJ Health Care has lost, and continues to lose approximately $500,000 per month in revenue.

58. Moreover, such delays are causing NJ Health Care substantial damage to its reputation and credibility in the industry, and in particular, with the referring physicians who were advised over two years ago that the Facility would be undergoing extensive renovations, including the second floor construction planned, that would offer luxurious private rooms for its patients and would render the Facility the premier center in the area from both the patients' and health care professionals' perspectives alike.

59. The damage to NJ Health Care's reputation and credibility caused by FNR's failure to fund the $2.5 million Leasehold Improvement Reserve has, in turn, caused a number of offering physicians to place their patients at one or more competitive facilities that offer the private rooms that NJ Health Care has been seeking to offer through its contemplated expansion project. Further, the failure to fund the renovation, which would increase revenues, has caused the Debtor to be unable to pay rents.

60. The damage to NJ Health Care's reputation and credibility caused by FNR's failure to fund the Leasehold Improvement Reserve is also threatening to undo NJ Health Care's hard work and determination to provide the most comprehensive subacute medical care in the

northern New Jersey area, and will likely render moot the substantial advancements and innovations which NJ Health Care has implemented since the Lease term began in June 2012.

61.   In sum, FNR's inability and/or unwillingness to perform its obligations to fund the $2,500,000 Leasehold Improvement Reserve for the new construction and renovations to the Facility, has created the issues that have led the Debtor into bankruptcy.

## SECURED CLAIM OF JZ VENTURES, LLC

62.   On or about April 25, 2014, the Debtor entered into a Secured Promissory Note ("Note A") with JZ Ventures, LLC ("JZ" or "Lender") for $363,563.50. On April 25, 2014, pursuant to an agreement between Lender and Durham Commercial Capital Corp. ("Durham"), Lender succeeded to all of Durham's right under a Nonrecourse Receivables Purchase Contract and Security Agreement (dated September 5, 2013) between Debtor and Durham.

63.   At the time Lender succeeded to Durham's rights, Debtor owed Durham no less than $559,203.49 ("Loan B"). In addition to the debts under Note A and Note B, the Lender has incurred other costs. As security for Note A and Note B, the Lender (subject to Debtor's continuing due diligence) enjoys a first priority lien and security interest in all or substantially all of the assets of the Debtor as collateral for Debtor's obligation to Lender.

64.   As of the Petition Date, Lender alleges that the Debtor is in default under Note A and Note B. The Lender alleges that the Debtor owes it $1,055,883.19, which includes principal, interest, and costs. The Debtor opines that its personal property has a value of approximately $300,000 and accounts receivable total approximately $4,000,000 (with collectible accounts receivable of approximately $3,000,000).

## CIRCUMSTANCES LEADING TO BANKRUPTCY

65. Litigation between the Debtor and FNR over the interpretation of the APA, Lease and Purchase Option has been ongoing in the Superior Court of New Jersey, Chancery Division, Passaic County ("State Court Action").

66. On January 13, 2015, the Superior Court of New Jersey issued an opinion granting summary judgment, in part, to FNR requiring the Debtor to pay all rental obligations due to FNR under the lease. The debtor argued that it was not required to pay rents because FNR breached the agreement to obtain financing for renovations. The court specifically acknowledged that the Debtor has remedies against FNR for damages and that the Debtor has arguments in "equity." Thereafter, on February 17, 2015, the Superior Court entered an Order in connection with the opinion ("February 17th Order"). The February 17th Order provides that the Debtor must pay FNR all rent due by March 19, 2015 (within thirty (30) days of February 17, 2015). If rent was not paid by March 19, 2015, a certain Transfer Agreement would be triggered, which would have required the Debtor to convey its Facility to FNR. The approximate amount due is $1,600,000.

67. Contrary to FNR's believe, this is not a typical landlord/tenant case for unpaid rent. FNR's purchase of the Facility was originally structured, and restructured, not only as an investment but also to save the property from foreclosure. The sellers wanted to continue operating the Facility but needed investment capital to do so. As a result, the transaction was structured as a sale-leaseback arrangement with an option to repurchase at a later date. All of the individual agreements are inextricably intertwined, and designed to achieve the specific result of allowing the operators of the Facility, now being NJ Health Care, to continue their operations

while providing an extremely attractive and substantial return on FNR's investment in the Facility.

## THE DEBTOR'S CHAPTER 11 FILING

68. The Debtor filed its chapter 11 petition late on March 19, 2015 (the "Petition Date"), after negotiations between FNR and the Debtor broke down. The Debtor intends to continue operating the Facility by utilizing its cash and future revenues in accordance with the debtor-in-possession operating budget annexed to the Motion for Use of Cash Collateral.

## FIRST-DAY MOTIONS

69. Subsequent to the filing of its chapter 11 petition, the Debtor filed certain motions and proposed Orders (collectively, the "First Day Orders"). The Debtor requests that each of the First Day Orders described below be entered, as each constitutes a critical element in achieving a successful result in the Debtor's chapter 11 case for the benefit of all parties-in-interest.

(i) Order Granting Expedited Consideration of First Day Matters;

(ii) Order Establishing Administrative Procedures for the Allowance of Interim Compensation and Reimbursement of Expenses of Professionals Retained by order of this Court;

(iii) Order Authorizing the Debtor to Continue to Accept Credit Cards as a Method of Payment by Customers in the Ordinary Course of Business in the Same Manner as the Debtor Accepted Credit Card Payments before the Petition Date;

(iv) Order Authorizing the Debtor to Continue Using Its Existing Cash Management System, Bank Accounts, and Business Forms; (b) Granting a Waiver of the Deposit Guidelines as Set forth in Section 345 of the Bankruptcy Code; and (c) Granting Such Other Relief as This Court Deems Just and Equitable ("Cash Management Motion");

(v) Order (i) Authorizing the Debtor to Pay Pre-Petition Wages, Salaries, Withholding, and Payroll-related Taxes for Pre-petition Periods; (ii) Directing All Banks to Honor Pre-petition Checks for Payment of Pre-petition Employee Obligations; and (iii) Authorizing the Debtor to Honor Workers' Compensation

and Certain Employee Benefit Obligations, Pursuant to Title 11 of the United States Code sections 105(a), 507(a)(4), and 507(a)(5) ("Wage Motion"); and

(vi) (1) A Bridge Order and (2) a Final Order Pursuant to 11 U.S.C. §§105(a) and 366, (a) Prohibiting Its Utility Companies from Discontinuing, Altering or Refusing Service to the Debtor, (b) Deeming the Utility Companies Adequately Assured of Future Performance on the Basis of Payment of a Utility Deposit, and (c) Establishing Procedures for Resolving Requests for Additional Assurance of Payment ("Utilities Motion").

I hereby certify that the foregoing statements made by me are true. If any of the foregoing statements made by me is willfully false, I recognize that I am subject to punishment.

Dated: March 20, 2015                    /s/ Linda Bowersox
                                         LINDA BOWERSOX

4823-5214-3650, v. 1

*Exhibit "A"*



ADVACAR-01    AGOTTLIEB

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY): 3/19/2015

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

**PRODUCER**
MGI Brokerage Inc.
5120 13th Ave.
Brooklyn, NY 11219

CONTACT NAME:
PHONE (A/C, No, Ext): (718) 972-3705
FAX (A/C, No): (718) 851-2855
E-MAIL ADDRESS: info@mgibrkg.com

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: SCOTTSDALE INSURANCE COMPANY | |
| INSURER B: PHILADELPHIA INSURANCE COMPANY | 6777 |
| INSURER C: COMPANION PROP & CASUALTY | |
| INSURER D: | |
| INSURER E: | |
| INSURER F: | |

**INSURED**
Advanced Care Center at Lakeview
130 Terhune Drive
WAYNE, NJ 07470

**COVERAGES**    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY <br> ☐ CLAIMS-MADE  X OCCUR <br> X Prof & Gen Liability <br><br> GEN'L AGGREGATE LIMIT APPLIES PER: <br> X POLICY  ☐ PRO-JECT  ☐ LOC <br> ☐ OTHER | | | KBS0000001 | 07/29/2014 | 07/29/2015 | EACH OCCURRENCE <br> DAMAGE TO RENTED PREMISES (Ea occurrence) <br> MED EXP (Any one person) <br> PERSONAL & ADV INJURY <br> GENERAL AGGREGATE <br> PRODUCTS - COMP/OP AGG | $ 1,000,000 <br> $ 300,000 <br> $ 5,000 <br> $ 1,000,000 <br> $ 3,000,000 <br> $ 3,000,000 <br> $ |
| B | AUTOMOBILE LIABILITY <br> ☐ ANY AUTO <br> ☐ ALL OWNED AUTOS  X SCHEDULED AUTOS <br> X HIRED AUTOS  X NON-OWNED AUTOS | | | PHPK1041215 | 07/02/2014 | 07/02/2015 | COMBINED SINGLE LIMIT (Ea accident) <br> BODILY INJURY (Per person) <br> BODILY INJURY (Per accident) <br> PROPERTY DAMAGE (Per accident) | $ 1,000,000 <br> $ <br> $ <br> $ <br> $ |
| | ☐ UMBRELLA LIAB  ☐ OCCUR <br> ☐ EXCESS LIAB  ☐ CLAIMS-MADE <br> ☐ DED  ☐ RETENTION $ | | | | | | EACH OCCURRENCE <br> AGGREGATE | $ <br> $ <br> $ |
| C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY <br> ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) <br> If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | X | 10000016084114 | 07/10/2014 | 07/10/2015 | ☐ PER STATUTE  ☐ OTHER <br> E.L. EACH ACCIDENT <br> E.L. DISEASE - EA EMPLOYEE <br> E.L. DISEASE - POLICY LIMIT | $ 1,000,000 <br> $ 1,000,000 <br> $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
certificate holder is listed as Landlord & additional Insured
Location : 130 Ternhube Dr Wayne, NJ 07470

**CERTIFICATE HOLDER**

Advanced Care Center at Lakeview
130 Terhune Drive
WAYNE, NJ 07470

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

AUTHORIZED REPRESENTATIVE
*Malkiel Gottlieb*

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD